UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF ILLINOIS

JOHN WOODS,

    Plaintiff,

v.  09-2195

DOCTOR BASHIR AMEJI, TERRY FUEYO,
R. SCHAFFER, MARY MILLER, and
WEXFORD, INC.,

    Defendants.

## MEMORANDUM OPINION AND ORDER

Before the court are the Defendants, Wexford Health Sources, Inc., Dr. Ronald Schaefer, Terry Fueyo, Dr. Bashirahmed Ameji's summary judgment motion [41] and the Plaintiff's response [45].

### Standard

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Any discrepancies in the factual record should be evaluated in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (*citing Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)). The party moving for summary judgment must show the lack of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In order to be a "genuine" issue, there must be more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.

"Summary judgment is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2000). "If a party . . . fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it." Fed. R. Civ. P. 56(e). A party opposing summary judgment bears the burden to respond, not simply by resting on its own pleading but by "set[ting] out specific facts showing a genuine issue for trial." *See* Fed. R. Civ. P. 56(c). In order to be a "genuine" issue, there must be more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "If

1

[the nonmovant] does not [meet his burden], summary judgment should, if appropriate, be entered against [the nonmovant]." Fed. R. Civ. P. 56(e). Further, "[t]he plaintiff cannot merely allege the existence of a factual dispute to defeat summary judgment …. Instead, he must supply evidence sufficient to allow a jury to render a verdict in his favor." *Basith v. Cook County*, 241 F.3d 919, 926 (7th Cir. 2001). Specifically, the non-moving party "must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial." *Filipovic v. K&R Express Systems, Inc.*, 176 F.3d 390, 390 (7th Cir. 1999). Failure by the non-movant to meet all of the above requirements subjects him to summary judgment on his claims.

Affidavits must be based on the personal knowledge of the affiant and "set out *facts* that would be admissible in evidence." Fed. R. Civ. P. 56(c)(4) (emphasis added). Personal knowledge may include inferences and opinions drawn from those facts. *Visser v. Packer Eng. Assoc., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991). "But the inferences and opinions must be grounded in observation or other first-hand personal experience. They must not be based on flights of fancy, speculations, hunches, intuitions or rumors remote from that experience." *Visser*, 924 F.2d at 659. It is also well settled that "conclusory allegations and self-serving affidavits, if not supported by the record, will not preclude summary judgment. Keri v. Barod of Trustees of Purdue University, 458 F.3d 620, 628 (7th Cir.2006)(*citing Haywood v. N. Am. Van Lines, Inc.*, 121 F.3d 1066, 1071 (7th Cir.1997).

Background

Plaintiff, John Woods, is an inmate currently incarcerated at the Danville Correctional Center by the Illinois Department of Corrections. He alleges that while he was incarcerated at the Danville Correctional Center, he suffered violations of his constitutional rights, under the Eighth Amendment. Specifically, Plaintiff alleges that he suffered deliberate indifference to a serious medical need in the treatment of his umbilical hernia. In his complaint, he alleges that a doctor at Provena Medical Center advised him that he needed surgery to repair his hernia. He alleges that he was denied an abdominal belt and surgery. It is undisputed that the Plaintiff's umbilical hernia was known to the Defendants. Dr. Ameji and Dr. Schaefer both evaluated the Plaintiffs hernia on multiple occasions. Defendants assert that Plaintiff was never a candidate to have his hernia surgically repaired because the surgery was not medically necessary. The Defendants claims that the Plaintiff's hernia remained reducible at all times during his treatment by the Defendants. Additionally, Defendants assert that they provided the Plaintiff with conservative treatment in the form of a hernia belt. Defendants contend that Plaintiff's medical concerns were not met with deliberate indifference at any time and as such, summary judgment is appropriate in this case.

Undisputed Facts[1]

1. Plaintiff is an inmate within the Illinois Department of Corrections. He is incarcerated because he has been convicted of Murder, Armed Robbery, Attempted Murder and burglary. (See Exhibit 1, Wood deposition, pp. 8-9.)
2. Plaintiff initially suffered an umbilical hernia in August of 2005. (Exhibit 1, p. 6-7).
3. Plaintiff did not experience any problems with his hernia until March 3, 2006. (Exhibit 1, p. 7.)
4. Plaintiff has been able to reduce his hernia at all times except for the time he was hospitalized on September 7, 2006. (Exhibit 1, p. 13.)
5. Plaintiff has been able to maintain a job in the Dietary at the Danville Correctional since 1996. (Exhibit 1, p. 23.)
6. Plaintiff was able to play basketball on the yard up until 8 months ago. (Exhibit 1, p. 26.)
7. Plaintiff understands that one of the risks of surgical repair of his hernia is death. (Exhibit 1, p. 35.)
8. At some time in 2006, Plaintiff was provided what he calls a weight belt, which was an elastic band that he could Velcro around his midsection to secure his hernia. (Exhibit 1, p.14-15.)
9. Plaintiff has seen Dr. Paul Talbot at the Danville Correctional Center. Dr. Talbot has not recommended the Plaintiff receive surgery for his umbilical hernia. (Exhibit 1, p. 38-39.)
10. On May 31, 2006, Dr. Ameji saw the Plaintiff in regards to complaints of a boil on his left chest. Dr. Ameji evaluated the boil and provided the Plaintiff with medication. (See Exhibit 2, Ameji Affidavit; and Exhibit 5, IDOC records, p. 21.)
11. On September 7, 2006, Plaintiff came to the Health Care Unit and complained that a hernia had "popped out". The RN noted that the Plaintiff had a golf-ball-size umbilical hernia. The inmate stated that it pops out approximately four to five times a year, and he is usually able to reduce it himself. Plaintiff alleged that he could not reduce the hernia at this time. Dr. Ameji was notified by telephone and ordered the inmate to be transferred to the emergency room due to the danger of incarceration. Plaintiff was taken to the emergency room at the Provena United Samaritans Medical Center in Danville, Illinois. (Ameji Affidavit; and IDOC records, p. 22.)
12. At the emergency room, the Plaintiff was diagnosed with an umbilical hernia which the physician was able to reduce. (Ameji Affidavit; and Exhibit 6, Provena United Samaritans Medical Center Records, p. 7.)
13. At the emergency room, they also performed a CT-scan on the Plaintiff's abdomen. The CT-scan revealed an umbilical hernia which contained omental fat as well as no evidence of a bowel herniation or obstruction. (Ameji Affidavit; and PUSMC records, p. 10.)

14. Plaintiff returned to the institution on September 8, 2006, and was scheduled for follow up

---

[1]The exhibits can be found attached to Defendants' summary judgment motion [41]. The Plaintiff attached over 180 documents to his response, but does not point to any of these documents in his response, except for two instances when he points to Exhibit A and an Exhibit dated 8/27/08.

with Dr. Ameji. (Ameji Affidavit; and IDOC records, p. 23.)
15. Dr. Ameji followed up with the Plaintiff on September 19, 2006. On that date, Dr. Ameji performed an evaluation of the Plaintiff and educated him as to changes in his diet, taking his medications for his diabetes, and instructing him as to exercises he can do to help both his diabetes condition and his umbilical hernia. (Ameji Affidavit; and IDOC records, p. 25.)
16. The next time the Plaintiff came to the Health Care Unit was December 14, 2006. On that date, the Plaintiff was seen by a registered nurse. The Plaintiff was making subjective complaints of a lump in his groin. Objectively, the nurse found that the Plaintiff had a small 1 to 2 centimeter sized lump on the left medial thigh/groin area. There was no redness or swelling of the surrounding area. Additionally, there was no tenderness with palpitation. (Ameji Affidavit; and IDOC records, p. 26.)
17. Plaintiff next returned to the Health Care Unit on January 18, 2007. Plaintiff's complaints on that date were in regards to a draining boil on his left side. A culture was done of the drainage from the wound which revealed the Plaintiff was suffering from a MRSA infection. (Ameji Affidavit; and IDOC records, p. 31.)
18. Dr. Ameji's next note in the records was January 23, 2007. Dr. Ameji was following up with the Plaintiff after the lab results were received. Dr. Ameji's note is in regard to the MRSA infection Plaintiff had suffered. Plaintiff made no complaints as to his hernia on this date. (Ameji Affidavit; and IDOC records, p. 31.)
19. Dr. Ameji next saw the Plaintiff on January 31, 2007, also as a follow up. Plaintiff had an EKG done on January 20, 2007. Dr. Ameji went over the results of the EKG with the Plaintiff. Plaintiff made no complaints as to his hernia on this date. (Ameji Affidavit; and IDOC records, pp. 32-33.)
20. Dr. Ameji's next note in the Plaintiff's records is dated February 15, 2007. On that date, Dr. Ameji saw the Plaintiff following the results of a cardiology stress test. Plaintiff did not make any complaints in regards to an umbilical hernia on this date. (Ameji Affidavit; and IDOC records, p. 35.)
21. On February 28, 2007, Dr. Ameji performed a collegial review with Dr. Funk in regards to Plaintiff's case of diabetes mellitus as well as the EKG results of the Plaintiff. This collegial review was not in regards to anything to do with Plaintiff's umbilical hernia. (Ameji Affidavit; and IDOC records, p. 36.)
22. On March 4, 2007, Plaintiff was seen by an LPN. On that date, Plaintiff subjectively told the LPN he did not know what he had been called over to the Health Care Unit for. Plaintiff made no complaints to the LPN in regards to his umbilical hernia. Plaintiff was brought over to the Health Care Unit to prepare him for a medical furlough in the morning for a stress test. Plaintiff made no complaints in regards to his umbilical hernia. (Ameji Affidavit; and IDOC records, p. 38.)
23. From March 5, 2007 to July 23, 2007, Plaintiff made no complaints to the Health Care Unit whatsoever. (Ameji Affidavit.)
24. On July 24, 2007, Plaintiff was seen by an RN. Plaintiff was complaining of pain in the upper right quadrant of his abdomen. It was noted the Plaintiff had a history of an umbilical hernia. The medical records indicate that Plaintiff was advised by the nurse to

limit weight lifting as much as possible and to wear a back brace[2] that was provided to him[3]. Plaintiff was also provided with Tylenol. (Ameji Affidavit; and IDOC records, p. 40.)
25. Dr. Ameji next saw the Plaintiff on July 30, 2007. He noted that Plaintiff's blood work had been taken and that Plaintiff would need to return in two to three days to review the blood work with Dr. Ameji in the Diabetes Clinic. (Ameji Affidavit; and IDOC records, p. 41.)
26. Dr. Ameji followed up with the Plaintiff on August 9, 2007 in the Diabetic Clinic. On that date, Dr. Ameji evaluated the Plaintiff's blood test results and provided treatment to the Plaintiff in regards to his Diabetes. Plaintiff did not make any complaints as to an umbilical hernia on this date. (Ameji Affidavit; and IDOC records, p. 42.)
27. Plaintiff made no complaints or visits to the Health Care Unit against until September 6, 2007 when blood was drawn for his regularly scheduled Diabetic Clinic. (Ameji Affidavit; and IDOC records, p. 43.)
28. On September 17, 2007, Dr. Ameji reviewed those results with the Plaintiff in the Diabetic Clinic. Again, this visit was in relation to Plaintiff's diabetes mellitus, and Plaintiff made no complaints in regards to his umbilical hernia. (Ameji Affidavit; and IDOC records, p. 44.)
29. The next visit Plaintiff made at the Health Care Unit was November 28, 2007. On that date, Plaintiff was seen by an LPN. Plaintiff was complaining in regards to his hernia and stating that he could not keep it in any more. (Ameji Affidavit; and IDOC records, p. 45.)
30. On November 30, 2007, Plaintiff was seen by a Physicians Assistant. The Physicians Assistant noted that the Plaintiff was complaining of abdominal pain in relation to his umbilical hernia. The PA noted that the Plaintiff complained that with bowel movements, his pain became worse. However, it is noted the Plaintiff was able to reduce the hernia at all times. The Physicians Assistant provided the Plaintiff with Metamucil and Tylenol and instructed the Plaintiff to avoid heavy lifting. (Ameji Affidavit; and IDOC records, pp. 45-46.)
31. Plaintiff made no visits to the Health Care Unit again until January 3, 2008. On that date, the Plaintiff's blood was drawn in relation to his regularly scheduled Diabetes Clinic. Ameji Affidavit; and IDOC records, p. 46.)
32. Dr. Ameji next saw the Plaintiff on January 14, 2008, in the Diabetes Clinic. On that date, he again provided evaluation and treatment of the Plaintiff's diabetes mellitus. Additionally, Dr. Ameji offered the Plaintiff a digital rectal exam due to some concerns noted in the Plaintiff's tests with his prostate. Plaintiff refused the digital rectal exam

---

[2]The Plaintiff disputes that the nurse advised him to limit weight lifting as much as possible. Plaintiff states that "he does not lift weight and there is no way the nurse could have told to stop lifting weights at all." The court notes that whether or not the nurse advised him to limit weight lifting is not a dispositive fact.

[3]In his response to Defendants' Undiputed Facts number 24, Plaintiff admits he was provided with a back brace.

5

against medical advice. Plaintiff made no complaints of his umbilical hernia to Dr. Ameji during this visit. (Ameji Affidavit; and IDOC records, pp. 49-50.)

33. Plaintiff's next visit at the Health Care Unit was on February 14, 2008. On that date, the Plaintiff made a visit to the Health Care Unit in order to renew his medications in relation to his diabetes. Plaintiff made no complaints of any problems with his umbilical hernia at this time. (Ameji Affidavit; and IDOC records, p. 51.)

34. The next time the Plaintiff came to the Health Care Unit was on May 20, 2008. On that date, Plaintiff was getting his labs drawn for his regularly-scheduled visit in the Diabetic Clinic. (Ameji Affidavit; and IDOC records, p. 51.)

35. Dr. Ameji saw the Plaintiff on May 22, 2008, and reviewed his lab results. He noted the Plaintiff needed to control his glucose more strictly. Plaintiff made no complaints in regards to his hernia on this date. (Ameji Affidavit; and IDOC records, p. 52.)

36. On May 28, 2008, the Plaintiff was seen by a Physician's Assistant in the Diabetic Clinic for further evaluation. (Ameji Affidavit; and IDOC records, p. 53.)

37. Plaintiff's next visit was on July 2, 2008. On that date, Plaintiff was seen by a Physician's Assistant. This visit was in relation to Plaintiff's diabetes treatment. Plaintiff made no complaints as to his umbilical hernia. (Ameji Affidavit; and IDOC records, p. 54.)

38. On July 10, 2008, Plaintiff again followed up with that Physician's Assistant with results from the July 2, 2008 visit. Again, Plaintiff made no complaints of his umbilical hernia on this visit. (Ameji Affidavit; and IDOC records, p. 55.)

39. Plaintiff's next visit was August 19, 2008. Likewise, this visit was in relation to Plaintiff's Diabetes Clinic and was a visit with the Physician's Assistant. According to the records, Plaintiff made no complaints in regards to his umbilical hernia. (Ameji Affidavit; and IDOC records, p. 56.)

40. Dr. Ameji next saw the Plaintiff on August 27, 2008. On that date, he performed an examination of the Plaintiff and noted that the Plaintiff did make complaints in regards to his umbilical hernia. At the time of that evaluation, the Plaintiff's hernia was such that no treatment was necessary in Dr. Ameji's medical opinion. However, Dr. Ameji did prescribe the Plaintiff to be given an abdominal binder to help keep the hernia reduced. (Ameji Affidavit; and IDOC records, pp. 57, 322, and 243.)

41. On September 10, 2008, the Plaintiff was seen by the Physician's Assistant for his regularly scheduled Diabetic Clinic. Plaintiff made no complaints with regard to his abdominal hernia during this visit. (Ameji Affidavit; and IDOC records, p. 59.)

42. Plaintiff followed up to that visit with the Physician's Assistant on September 19, 2008. Again, Plaintiff made no complaints in regards to his umbilical hernia. (Ameji Affidavit; and IDOC records, p. 60.)

43. Plaintiff's next visit to the Health Care Unit was on December 3, 2008 requesting copies of his medical records. (Ameji Affidavit; and IDOC records, p. 62.)

44. On December 30, 2008, Plaintiff made a request for the abdominal binder Dr. Ameji prescribed him to the nurse on duty. The nurse checked the supply storage and found an abdominal binder but it would not fit the inmate[4]. She requested that a new, larger size of

---

[4] In this fact, the Defendant states the abdominal binder would not fit the inmate due to his obesity. The Plaintiff disputes that he is obese. He asserts that he is in great shape and that

abdominal binder be ordered. (Ameji Affidavit; and IDOC records, pp. 62-63.)
45. Plaintiff returned to the Health Care Unit on January 1, 2009. Again, he complained to a registered nurse about having a hernia that was beginning to hurt him all the time. Plaintiff alleged that he was not trying to reduce the hernia any longer because it would not stay in. The registered nurse performed an examination of the Plaintiff, finding that bowel sounds were present in all four quadrants and that the abdomen was soft. Additionally, the RN found the umbilical hernia to be non-distended but protruding. The nurse filled out a routing form for the binder and directed the Plaintiff to be seen by an MD. (Ameji Affidavit; and IDOC records, p. 64.)
46. Dr. Ameji followed up with the Plaintiff on January 13, 2009. He evaluated the Plaintiff's umbilical hernia. Dr. Ameji noted the Plaintiff had been suffering the umbilical hernia for approximately three years, since he had come from the Pontiac Correctional Center. Again, Dr. Ameji ordered the Plaintiff to be provided with an abdominal binder. (Ameji Affidavit; and IDOC records, p. 67.)
47. Dr. Ameji again followed up with the Plaintiff on January 15, 2009. That visit was strictly in relation to Plaintiff's diabetes mellitus. (Ameji Affidavit; and IDOC records, pp. 68 and 69.)
48. On January 31, 2009, Plaintiff again came to the Health Care Unit to speak with the LPN. On that date, he was again complaining that he had not received his abdominal binder. On this date, the LPN located and provided the Plaintiff with his hernia belts[5]. She instructed him on how to put it on and to wear it while he was awake and working. Plaintiff voiced understanding. (Ameji Affidavit; and IDOC records, pp. 70 and 71.)
49. On February 15, 2009, Plaintiff returned to the Health Care Unit and complained to the LPN that the binder was not working and he was still having pain and trouble using the restroom. As a result, the LPN put the Plaintiff on the MD Call Line. (Ameji Affidavit; and IDOC records, p. 72.)
50. On February 19, 2009, Plaintiff was seen by another MD who evaluated the Plaintiff's problem. That MD noted that the Plaintiff's umbilical hernia was easily reducible and that the patient was not wearing the hernia belt which was given to him. Plaintiff was instructed by this MD to wear the abdominal belt and provided no further orders. (Ameji Affidavit; and IDOC records, p. 72.)
51. On April 10, 2009, Plaintiff again came to the Health Care Unit. On this date, he was complaining to the LPN that he had not received his hernia belt. The LPN noted that the routing form had been sent to K. VanWinkle, the secretary, concerning this matter.

---

"weight is not the issue..." Plaintiff does not dispute that the available abdominal binder did not fit him.

[5]The Plaintiff denies that the LPN gave him a hernia belt, but does not dispute in Fact number 49 that two weeks later, on February 15, 2009, he returned to the HCU complaining that the binder was not working. Further, when he attempts to dispute Fact number 50, he acknowledges that he was given a belt when he "denies that he was given a belt due to the one which was given to him was not the correct belt." Therefore, the court finds Plaintiff was provided with a hernia belt on January 31, 2009.

(Ameji Affidavit; and IDOC records, p. 73.)
52. Plaintiff was next seen on April 28, 2009, in his regularly scheduled Diabetic Clinic. Plaintiff was seen by a Physician's Assistant. According to the records, Plaintiff did not make any complaints in regards to his umbilical hernia. (Ameji Affidavit; and IDOC records, p. 75.)
53. Plaintiff next visited the Health Care Unit on May 12, 2009. Plaintiff made complaints in regards to drainage from his ear. Plaintiff was evaluated by a registered nurse and provided treatment. Plaintiff made no complaints in regards to his umbilical hernia at this visit. (Ameji Affidavit; and IDOC records, p. 76.)
54. Plaintiff was again evaluated by a Physician's Assistant on May 29, 2009. That visit was in follow-up to his previous Diabetic Clinic visit. Plaintiff made no complaints in regards to his umbilical hernia. (Ameji Affidavit; and IDOC records, p. 77.)
55. On June 29, 2009, the Physician's Assistant again evaluated the Plaintiff. On that date, the Plaintiff was informed of his latest blood test results. The Physician's Assistant directed the Plaintiff to exercise daily and to improve his diet. Plaintiff made no complaints in regards to his umbilical hernia. (Ameji Affidavit; and IDOC records, p. 78.)
56. On July 29, 2009, Plaintiff was seen by an LPN in the Health Care Unit. Plaintiff was checking to see if his abdominal binder had come in. The LPN checked and no binder was found. (Ameji Affidavit; and IDOC records, p. 79.)
57. On August 17, 2009, Plaintiff was again seen by an RN. On that date, Plaintiff was complaining that his left arm was swollen and painful ever since they had taken his blood on August 10, 2009. Plaintiff made no complaints in regards to his umbilical hernia on that date. (Ameji Affidavit; and IDOC records, pp. 79 and 80.)
58. August 17, 2009, is the date the Plaintiff filed his Complaint in this matter. (Ameji Affidavit.)
59. It appears from these records that the last time Dr. Ameji visited with the Plaintiff was January 13, 2009. Following that date, Dr. Ameji retired from working at the Danville Correctional Center. (Ameji Affidavit.)
60. Plaintiff suffered from a small umbilical hernia the entire time that Dr. Ameji treated him at the Danville Correctional Center. An umbilical hernia does not require surgical intervention. (Ameji Affidavit.)
61. Specifically, Plaintiff's hernia did not require surgical intervention because it was easily reducible at all times. While it is true that an enstrangulated umbilical hernia can be a medical emergency, there is no evidence that Plaintiff's umbilical hernia ever became enstrangulated. In fact, the one time the Plaintiff was sent out to the hospital due to a concern that the Plaintiff's hernia had become enstrangulated, it was easily reduced once he arrived at the emergency room. (Ameji Affidavit.)
62. Dr. Ameji did not recommend surgical intervention for the Plaintiff's umbilical hernia due to the concerns for complications presented by surgical intervention. Specifically, surgery creates a risk of infection, bleeding and injury to the large intestine. These risks are

complicated by the fact that the Plaintiff has a fairly serious case of diabetes mellitus. (Ameji Affidavit.)
63. Umbilical hernias are fairly common in adults. They are seen more in overweight people. Smaller hernias with no symptoms can be watched. Surgery may pose greater risks for

patients with serious medical problems. The Plaintiff in this case falls within this category. The fact that the Plaintiff has serious diabetes and other complicating factors makes him a candidate for conservative treatment of his umbilical hernia. (Ameji Affidavit.)

64. Furthermore, Plaintiff was able to maintain a normal lifestyle within the correctional setting with his umbilical hernia. In fact, Plaintiff was able to maintain a job the entire time that he was under Dr. Ameji's care. (Ameji Affidavit.)

65. Dr. Ameji's treatment of the Plaintiff was based on Dr. Ameji's own medical judgment, experience and the clinical condition of the Plaintiff[6]. (Ameji Affidavit.)

66. Dr. Ameji's treatment of the Plaintiff was not based on any Wexford Health Sources policy or procedure. While Dr. Ameji was aware of the Wexford guidelines in regards to abdominal hernias, Dr. Ameji based his treatment decisions of the Plaintiff on Plaintiff's condition and Dr. Ameji's judgment and experience. (Ameji Affidavit.)

67. It appears from the medical records that the Plaintiff continued to seek what is known as an abdominal binder even after he was provided with a hernia belt[7]. These two terms are used interchangeably. It appears from the medical records that on January 31, 2009, the Plaintiff was provided with a hernia belt and instructed on how to put it on and to wear it when awake and working. Unfortunately, the Plaintiff was not compliant in using the hernia belt provided to him. (Ameji Affidavit.)

68. When Plaintiff made complaints in regards to the hernia belt, he was again instructed on how to use it and instructed to continue to wear it[8]. (Ameji Affidavit; and IDOC records, p. 72.)

69. Dr. Ameji is no longer employed at the Danville Correctional Center. Accordingly, Dr. Ameji is not in the position to provide Mr. Woods with the surgery he requests, nor would Dr. Ameji do so in direct contradiction to his findings in regards to Plaintiff's condition. (Ameji Affidavit.)

70. Dr. Schaefer treated the Plaintiff on February 19, 2009. On that date, Dr. Schaefer saw the Plaintiff in regards to his umbilical hernia. He noted that the Plaintiff's umbilical hernia was easily reduced and 1.5 x 2 inches in size. Additionally, Plaintiff's bowel sounds were positive, and Dr. Schaefer also noted the Plaintiff was not wearing the abdominal hernia belt that had been given to him. Dr. Schaefer's instruction to the Plaintiff at the time was to continue to wear the abdominal belt. He made no further

---

[6]Plaintiff dispute the fact, but does not provide any evidence that supports his self-serving dispute.

[7]In his response the Plaintiff claims he was provided with a groin belt, but had a abdominal hernia.

[8]Plaintiff attempts to dispute Fact number 68 by stating "Plaintiff brought the belt back because the back was causing more pain than before and he gave the defendants notice that he was having problems with the belt." This statement and the Exhibit he points to do not dispute the Defendants' Fact number 68. Exhibit A dated 8/27/08 a Medical Permit written by Dr. Ameji to order an abdominal belt.

9

treatment orders at the time. (See Exhibit 3, Schaefer Affidavit; and IDOC records, p. 72.)

71. This was the only evaluation Dr. Schaefer made of the Plaintiff during the relevant time period. (Schaefer Affidavit.)
72. Significantly, Dr. Schaefer noted that the Plaintiff's hernia was easily reducible at all times. (Schaefer Affidavit.)
73. At the time of Dr. Schaefer's evaluation, he did not believe the Plaintiff to be a candidate for surgical intervention. In Dr. Schaefer's assessment, Plaintiff did not require surgery to repair the umbilical hernia because it was easily reducible. Further, surgery has certain risk factors. Included in those is the patient's medical background. In this case, the Plaintiff had a fairly serious case of diabetes mellitus. Further, the Plaintiff was an obese man with a history of being noncompliant with doctor's orders. (Schaefer Affidavit.)
74. One of the risks of surgical intervention of a hernia of this type is recurrence of the hernia. One of the known risk factors for causing recurrence of a hernia of this type is obesity. The fact that Mr. Woods had been regularly monitored for his diabetes and counseled as to his diet for months prior to Dr. Schaefer's visit with Mr. Woods played into his decision making. In other words, the fact that the Plaintiff had been advised as to losing weight in the past but was noncompliant did weigh into Dr. Schaefer's consideration. (Schaefer Affidavit.)
75. Dr. Schaefer also took into consideration the fact that the Plaintiff was noncompliant in wearing the hernia belt that had been provided to him. Logically, if the Plaintiff was unwilling to wear the hernia belt that had been provided, it follows that he would not be compliant in following his post-surgical instructions as well as losing weight. All of these facts were considered by Dr. Schaefer in coming to his decision that the Plaintiff was not a candidate for surgical intervention. (Schaefer Affidavit.)
76. Dr. Schaefer's medical decisions were based on his judgment, training and experience. (Schaefer Affidavit.)
77. Dr. Schaefer's decisions were not based on any Wexford Health Sources, Inc. policies or procedures. (Schaefer Affidavit.)
78. According to the medical records, on December 30, 2008, Terry Fueyo, R.N. was approached by a nurse at the Danville Correctional Center in regards to obtaining an abdominal binder for the Plaintiff. (See Exhibit 4, Fueyo Affidavit; and IDOC records, pp. 62-63.)
79. On that date, the supply storage closet was checked for abdominal binders. An abdominal binder was located but Plaintiff indicated that it was not large enough to fit him. Terry Fueyo instructed the Plaintiff that he would order larger sizes of abdominal binders. (Fueyo Affidavit; and IDOC records, pp. 62-63.)
80. As Terry Fueyo instructed the Plaintiff, he ordered a larger size hernia belt/abdominal binder. (Fueyo Affidavit.)
81. This was Terry Fueyo's only involvement with the Plaintiff in regards to his umbilical hernia. (Fueyo Affidavit.)
82. Terry Fueyo knows from the medical records that Plaintiff was provided with a hernia belt on January 31, 2009. On that date, Plaintiff was instructed by a Registered Nurse on how to put on and wear the belt while awake and working. Plaintiff voiced his understanding and was instructed to return if problems persisted. (Fueyo Affidavit; and IDOC records,

10

pp. 70- 71.)
83. This belt was further evaluated by a medical doctor on February 19, 2009. It was noted at that time that Plaintiff was not compliant with wearing the belt that he was provided. Plaintiff was again instructed to wear the hernia belt as recommended. (Fueyo Affidavit; and IDOC records, pp. 72.)
84. Terry Fueyo's treatment of the Plaintiff was not related to any practice, policy or procedure of Wexford Health Sources, Inc. (Fueyo Affidavit.)
85. Terry Fueyo's limited treatment of the Plaintiff was based on Mr. Fueyo's medical training and judgment. (Fueyo Affidavit.)
86. At all times that Terry Fueyo was employed as the Director of Nursing, Plaintiff was under the care of, and had regular access to, a medical doctor. (Fueyo Affidavit.)

Discussion and Conclusion

In order to prove his claim, the Plaintiff must prove deliberate indifference to a serious medical need. At a minimum, this requires actual knowledge of impending harm which is easily preventable so that a conscious, capable refusal to prevent harm can be inferred from the Defendant's failure to prevent it. *Dixon v. Godinez*, 114 F.3d 640, 645 (7th Cir. 1997); Duckworth v. Franzen, 780 F.2d 645, 653 (7th Cir. 1985). Deliberate indifference is more than mere negligence and approaches intentional wrongdoing. *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). To establish deliberate indifference, Plaintiff must show the Defendant ignored a known risk. *Collignon v. Milwaukee County*, 163 F.3d 982, 988 (7th Cir. 1998). Further, in order to establish deliberate indifference, Plaintiff must show that the physician or other Defendants must both have been aware of the fact from which the inference could be drawn that a substantial risk of serious harm exists, and he must actually draw the inference. *Higgins v. Correctional Medical Services*, 178 F.3d 508, 511 (7th Cir. 1999).

The exercise by a physician of his professional judgment does not constitute deliberate indifference. *Youngberg v. Romeo*, 457 U.S. 307, 322-323 (1982). Medical decisions, such as whether one course of treatment is preferable to another, are beyond the Eighth Amendment's purview. Additionally, the Eighth Amendment is not a vehicle for bringing claims of medical malpractice. *Snipes v. DeTella*, 95 F.3d 586, 590 (7th Cir. 1996). It should also be kept in mind that inappropriate medical treatment based on pure negligence, or even a series of purely negligent acts, is not the same as indifference to a serious medical need. *Sellers v. Henman*, 41 F.3d 1100, 1102-03 (7th Cir. 1994). While a prisoner has the right to medical care, he does not have the right to determine the type and scope of the medical care he personally desires. A difference of opinion between a physician and the patient does not give rise to a constitutional right, nor does it state a cause of action under § 1983. *Coppinger v. Townsend*, 398 F.2d 392, 394 (10th Cir. Col. 1968). *See also Johnson v. Doughty*, 433 F.3d 1001 (7th Cir. 2006). Inattention to a medical condition amounts to a constitutional violation only where the medical condition is serious. *Brownell v. Figel*, 950 F.2d 1285, 1289 (7th Cir. 1991). Deliberate indifference may only be found when an official knows of and disregards an excessive risk to inmate health or safety. *See Duane v. Lane*, 959 F.2d 673, 676 (7th Cir. 1992). Deliberate indifference also requires that Defendants either intended to harm Plaintiff or knew of a risk of harm so significant that an intent to harm could be inferred from a refusal to provide medical care. *See Smith-Bey v.*

11

*Hospital Administrator*, 841 F.2d 751, 759 (7th Cir. 1988).

Plaintiff's claim is one in which he is asserting that the Eighth Amendment has been violated. The Eighth Amendment does not require that prisoners receive "unqualified access to healthcare." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). Rather, inmates are entitled only to "adequate medical care." *Boyce v. Moore*, 314 F.3d 884, 888-89 (7th Cir. 2002). Thus, the Eighth Amendment does not entitle an inmate to demand specific care.

Defendants are entitled to summary judgment because the Plaintiff did not suffer a medical need that required surgical intervention; he owned an abdominal belt and he was given a hernia belt. The Plaintiff states that he was given a groin belt rather than the abdominal belt prescribed by Dr. Ameji. Nevertheless, Defendants are still entitled to summary judgment. It is undisputed that Drs. Ameji and Schaefer personally provided treatment to the Plaintiff in regards to his umbilical hernia. By the time, Drs. Ameji and Schaefer treated the Plaintiff, he had been suffering with the hernia for one or two years. Dr. Ameji found the Plaintiff to be suffering from an umbilical hernia that was easily reducible. At the conclusion of all visits between the Plaintiff and Dr. Ameji or Dr. Schaefer, Plaintiff's hernia was found to be easily reducible and not in need of surgical intervention. Further, the Plaintiff does not dispute Fact number 72, where Dr. Schaefer noted that the Plaintiff's hernia was easily reducible at all times. In *Johnson*, the court found that a physician who evaluated an inmate on multiple occasions for a non-enstrangulated, non-emergent, reducible hernia was not deliberately indifferent in denying the Plaintiff's surgery. *See Johnson v. Doughty*, 433 F.3d 1001 (7th Circuit 2006). Non-surgical remedies, designed to alleviate the inmates' pain from the hernia are not a violation of the Eighth Amendment. *Johnson* at 1014. Here, as in *Johnson*, Dr. Ameji and Dr. Schaefer evaluated the Plaintiff and found the Plaintiff's hernia did not require surgery. Each time the Defendants evaluated the Plaintiff, the hernia was reducible and could be treated through non-surgical means. At no time was Plaintiff's hernia enstrangulated while he was at the Danville Correctional Center. In the Defendants' professional opinions, surgery was not required to repair Plaintiff's hernia. Rather than provide the Plaintiff with surgery, Defendants provided the Plaintiff with conservative treatment in the form of a hernia belt and ensuring that the hernia was reducible. The records show that the Defendants considered the Plaintiff's complaints and based their decisions on the physical examinations of the Plaintiff. Further, the record in this case indicates that Defendants' treatment of the Plaintiff was grounded in their professional judgment and that Plaintiff was afforded adequate, reasonable medical treatment. Therefore, the court finds that summary judgment is appropriate for the Defendants.

Further, Terry Fueyo is entitled to summary judgment because his care was so minimal as to not trigger constitutional scrutiny and his care of the Plaintiff was appropriate. Plaintiff has provided no evidence of defendant Fueyo's direct, personal involvement in any alleged denial of medical care, as required to sustain a claim against her under §1983. *See, e.g., Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir.1995). Plaintiff has also failed to provide evidence that the alleged violations of his constitutional rights occurred at Fueyo's direction or with her knowledge and consent. *Id.* Defendants are correct that personal involvement is required for liability under § 1983. "Section 1983 creates a cause of action based on personal liability and predicated upon fault; thus, liability does not attach unless the individual defendant caused or participated in a

constitutional deprivation." *Vance v. Peters,* 97 F.3d 987, 993 (7th Cir.1996) (*quoting Sheik-Abdi v. McClellan,* 37 F.3d 1240, 1248 (7th Cir.1994)); *see also Gentry v. Duckworth,* 65 F.3d 555, 561 (7th Cir.1995); *Black v. Lane,* 22 F.3d 1395, 1401 (7th Cir.1994). Plaintiff's only allegation is that Fueyo did not provide him with an abdominal binder. At the time that Fueyo was involved in Plaintiff's care, December 30, 2008, Plaintiff was already in possession of what he calls a weight belt. Plaintiff describes his "weight belt" as an elastic band
that can be velcroed around his mid section to help keep his hernia in place. Defendants assert that what Plaintiff describes is an abdominal binder. As such, the fact that Fueyo did not have one in his size in stock on December 30, 2009 did not injure the Plaintiff in any way. Further, Plaintiff was provided a different hernia belt on January 31, 2009. The Plaintiff's use of the belt was examined by Dr. Schaeffer on February 19, 2009. Following the examination the Plaintiff was ordered to wear the belt. Based on these facts, Terry Fueyo did not have enough personal involvement in the treatment of the Plaintiff's hernia to indicate a constitutional violation. Fueyo was involved in only one small aspect of the care of the plaintiff's hernia. He ordered a larger hernia belt/abdominal binder for the Plaintiff. There is no evidence to suggest Fueyo's actions in the case were deliberately indifferent to the Plaintiff's serious medical needs.

Finally, Wexford Health Source, Inc. is entitled to summary judgment because Plaintiff has failed to provide any evidence to show that his medical treatment was based on any Wexford policy or procedure. It is well established that Section 1983 does not give rise to causes of action based upon the doctrine of respondeat superior. "The doctrine of *respondeat superior* can not be used to hold a supervisor liable for conduct of a subordinate that violates a plaintiff's constitutional rights." *Chavez v. Illinois State Police*, 251 F.3d 612, 651 (7th Cir. 2001), *citing Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995). To be held liable for such a claim, a defendant must be personally responsible for the deprivation of constitutional right. It appears in plaintiff's complaint that he is attempting to state a claim against Wexford Health Sources, Inc., for vicarious liability. Defendant Wexford is correct that it cannot be held liable for the constitutional violations of its employees under a theory of *respondeat superior*. This is improper. *See Iskander v. Village of Forest Park*, 690 F.2d 126, 128 (7th Circuit 1982). In order to state a cause of action against a corporate defendant, the plaintiff must demonstrate that a constitutional deprivation occurred as a result of an expressed policy or custom. *Jackson v. Illinois Medicare, Inc*., 300 F.3d 760 (7th Circuit 2002). Liability attaches to Wexford if 1) an express policy caused the constitutional deprivation; 2) a widespread practice existed "so permanent and well-settled as to constitute a custom or usage within the force of law"; or 3) a person with "final policy-making authority" caused the constitutional deprivation. *Billings v. Madison Metropolitan School Dist.*, 259 F.3d 807, 816 (7th Cir. 2001), *citing McCormick v. City of Chicago*, 230 F.3d 319, 324 (7th Cir. 2000). *See also Baxter v. Bible County School Corporation*, 26 F.3d 728 (7th Circuit 1994).

In this case, there is no evidence of an expressed policy of defendant Wexford which caused a constitutional deprivation. Further, the plaintiff has put forth no evidence that creates an issue of material fact that a widespread practice was so permanent and well-settled as to constitute a custom or usage with the force of law. There is no testimony or evidence in this case concerning who is or is not a person of final policymaking authority. Therefore, no evidence has been submitted to prove any of the elements necessary to state a claim against Wexford Health

Sources, Inc., a corporation. In fact, the testimony in this case has been the exact opposite. According to Drs. Ameji and Schaeffer, each made their medical decisions based upon their own personal judgment on a case-by-case basis. Plaintiff denies this with arguments in his response, but he has not provided any evidence to refute the doctors' testimony. There is no evidence that any of the defendant doctors based their medical treatment decisions of the plaintiff on anything other than their experience, expertise, and education. Furthermore, there is no evidence to state that their treatment was based on any policy of Wexford Health Sources, Inc. The undisputed testimony of the doctors in this case establishes that the plaintiff has suffered no deliberate indifference to any serious medical need. Plaintiff has failed to establish any evidence of a custom, policy or practice for Wexford in this case. Therefore, the court finds Wexford Health Sources, Inc., is entitled to judgment as a matter of law.

It is therefore ordered:

1. Pursuant to Fed. R. Civ. P. 56(a), the Defendants' motion for summary judgment [41] is granted. The clerk of the court is directed to enter judgment in favor of the defendants and against the plaintiff. This lawsuit is terminated in its entirety. The parties are to bear their own costs.
2. If the plaintiff wishes to appeal this dismissal, he must file a notice of appeal with this court within 30 days of the entry of judgment. Fed. R. App. P. 4(a)(4). A motion for leave to appeal *in forma pauperis* should set forth the issues the plaintiff plans to present on appeal. *See* Fed. R. App. P. 24(a)(1)(C). If the plaintiff does choose to appeal, he will be liable for the $455.00 appellate filing fee irrespective of the outcome of the appeal. Furthermore, if the appeal is found to be non-meritorious, the plaintiff may also accumulate a strike under 28 U.S.C. 1915(g).
3. Although his lawsuit is dismissed, Plaintiff is obligated to pay the filing fee in full. Release from incarceration does not relieve the plaintiff's obligation to pay the filing fee in full.

Enter this 16th day of February 2011.

/s/ Michael P. McCuskey
_____
Michael P. McCuskey
Chief United States District Judge